IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SHAMAYAH THOMAS, | § | |
| | § | |
| Defendant Below, Appellant, | § | |
| | § | |
| | § | No. 268, 2022 |
| v. | § | |
| | § | |
| | § | Court Below: Superior Court |
| STATE OF DELAWARE, | § | of the State of Delaware |
| | § | |
| | § | |
| Appellee. | § | I.D. Nos. 1909006727, 2001007661, |
| | § | 2001006118, 2001006417(N) |

Submitted: July 26, 2023
Decided: October 2, 2023

Before **VALIHURA**, **TRAYNOR**, and **LeGROW**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

Christofer C. Johnson, Esquire, The Johnson Firm, Wilmington, Delaware for Appellant.

Kathryn Garrison, Esquire, Delaware Department of Justice, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

*INTRODUCTION*

On October 27, 2021, following a two-day bench trial in the New Castle County Superior Court, defendant below-appellant Shamayah Thomas ("Thomas") was convicted of Stalking and related acts of intimidation and harassment. Before his bench trial, Thomas filed a *pro se* Motion to Dismiss Current Counsel and/or to Appoint New Counsel on the grounds that his then-current counsel was not following his instructions regarding his pre-trial defense (the "First Motion to Dismiss Current Counsel").[1] The trial court denied Thomas's motion pursuant to Superior Court Rule 47.[2]

Also before trial, Thomas's counsel filed a motion to suppress digital evidence (the "Motion to Suppress") collected from Thomas's pink iPhone ("Pink iPhone"), alleging that law enforcement seized the phone without a warrant and, alternatively, that the search warrant issued following the seizure of the Pink iPhone ("Search Warrant") was constitutionally defective.[3] The trial court granted in part, and denied in part, the Motion to Suppress, ultimately admitting certain evidence extracted from the Pink iPhone.[4]

After trial, but before his sentencing, Thomas filed a second motion to dismiss current counsel and/or appoint new counsel (the "Second Motion to Dismiss Current Counsel" and together with the First Motion to Dismiss Current Counsel, the "Motions to

---

[1] App. to Answering Br. at B46–49 (Motion to Dismiss Current Counsel, dated Sept. 17, 2020) [hereinafter "First Motion to Dismiss Counsel"].

[2] *Id.* at B50 (Letter from Hon. Eric M. Davis, Judge, to Shamayah Thomas (Nov. 12, 2020)).

[3] *Id.* at B51–81 (Motion to Suppress Digital Evidence, dated Jan. 4, 2021) [hereinafter "Motion to Suppress"].

[4] App. to Opening Br. at A066 (Transcript of Status Conference at 5:9–11) [hereinafter "Status Conference at __"].

Dismiss Counsel").[5] Although the Superior Court prothonotary's office failed to direct the Second Motion to Dismiss Current Counsel to defense counsel or to the trial judge, the trial court addressed the motion at Thomas's sentencing hearing. Given the option of either delaying sentencing and proceeding *pro se*, or proceeding with his then-current counsel, Thomas chose to proceed with sentencing as scheduled, represented by his then-current counsel.

On appeal, Thomas argues that the Superior Court: (1) erred when it categorized the Pink iPhone Search Warrant as an overbroad warrant as opposed to an unconstitutional general warrant; and (2) failed to adequately address Thomas's Motions to Dismiss Counsel. Thomas asks this court to reverse his convictions and remand for a new trial. For the reasons set forth below, we **AFFIRM** the judgment of the Superior Court.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A. *Thomas's Arrests*

On September 11, 2019, New Castle County Police Department ("NCCPD") officer Roberto Ieradi was dispatched to a northern New Castle County apartment complex where one of the victims, A.S., lived with A.T., a child A.S. had with Thomas.[6] There, A.S. showed Ieradi a number of threatening messages on her phone from Thomas.[7] Ieradi took

---

[5] *Id.* at A031–35 (Motion to Dismiss and/or Appoint New Counsel, dated Mar. 22, 2022) [hereinafter "Second Motion to Dismiss Counsel"].

[6] App. to Opening Br. at A106–07 (Officer Roberto Ieradi Trial Testimony at 107:13–18, 112:12–16) [hereinafter "Ieradi at __"].

[7] The text messages Thomas sent to A.S. on September 11th included: "Nobody can't save you," "I'm a give you two minutes to call my phone or [A.T.] will be motherless," and "I'm going to come back over here and smoke your dumb ass." *Id.* at 108 (Ieradi at 114:19–115:4).

3

pictures on his police-issued phone of the threatening messages on A.S.'s phone screen. At the time, Thomas was subject to a protection from abuse ("PFA") order, which directed him to have no contact with A.T. or her family, including A.S. On September 17, 2019, Thomas was arrested by the NCCPD as a result of the September 11 incident and was indicted for Stalking, Aggravated Act of Intimidation, and Terroristic Threatening. As a condition of Thomas's bond, on September 17, 2019, the Justice of the Peace Court of Delaware in and for Sussex County ("JFP"), issued a no-contact order between A.S. and the defendant. On October 11, 2019, A.S. obtained an additional PFA against Thomas.[8]

Thereafter, Thomas continued to try to contact A.S. On January 11, 2020, Thomas's pretrial supervisor received an alert that Thomas had removed the GPS device that he was required to wear as a condition of his bond. The same day, NCCPD responded to a complaint from A.S. that Thomas had sent to her and to her friend, S.M., a number of alarming text messages on January 10 and January 11, all in violation of the no-contact orders.[9] In one message to S.M., Thomas asked, "Which one do you want to get hit with?" in reference to an attached image of two guns.[10] NCCPD Officer Cronin captured photographs of the messages on S.M.'s phone at the scene.

---

[8] *Id.* at A139 (Officer Jeffrey Geortler Trial Testimony at 30:8–23) (Officer Geortler testified that he served Thomas with this protection from abuse order on October 30, 2019).

[9] *Id.* at A092 (Officer Angelo Trapani Trial Testimony at 51:21–52:10) [hereinafter Trapani at __]; Id. at A086 (Officer Steven Cronin Trial Testimony at 27:5–28:2) [hereinafter Cronin at __"].

[10] *Id*. at A197 (Roberto Herrera-Cortes Trial Testimony at 87:14–17) [hereinafter Herrera-Cortes at __].

While officers were present at A.S.'s home, A.S. received a phone call from Thomas. Officer Cronin placed the call on speaker phone. A.T. was in the room. At the time, Officer Cronin's body camera was operating and captured footage of the call. On the call, Thomas threatened to kill A.S. As a result of the incident, pursuant to an arrest and search warrant for Thomas's person, NCCPD entered Thomas's apartment and arrested him on January 18, 2020.[11]

### B. The Search and Seizure of Thomas's Phone

#### 1. The Seizure of the Pink iPhone

While in Thomas's home executing the warrant for his arrest, NCCPD officers noticed a cell phone on the dining room table. Worried that the evidence on the phone would be manipulated or erased, the officers seized the phone. At that time, a search warrant for the phone had not yet been issued.

Detective Herrera-Cortes, a detective in the NCCPD's Family Crimes Unit, who also responded to A.S.'s report on January 11, knew the incident involved phone calls, texts, social media and photos. He also had reason to believe that Thomas had used multiple phones to commit the offenses. In an attempt to verify the owner of the Pink iPhone, Detective Herrera-Cortes called a known number of Thomas's to see if the Pink iPhone would ring. The Pink iPhone began ringing when Detective Herrera-Cortes placed that call.

---

[11] *Id.* at A066–67 (Transcript of Suppression Hearing on Oct. 19, 2021 at 6:11–13, 8:12–16) [hereinafter Suppression Hearing].

## 2. *The Affidavit in Support of the Warrant*

Thereafter, on January 31, 2020, Detective Herrera-Cortes applied for a warrant to search the Pink iPhone. The attached affidavit in support of the Search Warrant provided the following operative facts to establish probable cause that evidence of the crime of Stalking would be found in the data on the phone:

- Thomas was released to probation on February 22, 2019, after serving time for Aggravated Menacing and Criminal Contempt of a Domestic Violence Protective Order. The victim in the case was A.S. and a no contact order prohibited Thomas from contacting A.S. while Thomas was on probation.[12]

- Thomas was arrested by NCCPD on September 17, 2019, for Stalking and related charges after he had called A.S. multiple times and sent threatening messages to her cell phone. Included in the text messages were two photographs of a vehicle parked outside of two different locations where a victim was working.[13]

- On January 11 and 13, 2020, police officers conducting a domestic violence investigation into Thomas learned that Thomas had called A.S. and S.M. approximately 81 times from blocked numbers and that he had called and sent threatening text messages to them from a phone number (the 8763 number), which included "text messages sent of various handguns threatening the victims." He also sent threatening text messages to A.S.'s sister from the 8763 number and via Facebook Messenger. The officers obtained arrest warrants for Thomas for Terroristic Threatening Harassment and Non-Compliance with Conditions of Bond.[14]

- Officers arrested Thomas at a residence on January 18, 2020. Incidental to that arrest, they collected a Pink iPhone XR.[15]

---

[12] *Id.* at A039 (Affidavit ¶ 3).

[13] *Id.* (Affidavit ¶ 4).

[14] *Id.* at A039–40 (Affidavit ¶¶ 5–8).

[15] *Id.* at A040 (Affidavit ¶ 9).

- A phone call from a known number was placed to the phone number ending in 8763 and the known number appeared on the screen of the Pink iPhone as an incoming call.[16]

- A DELJIS inquiry revealed that the 8763 number belonged to Thomas.[17]

- The 8763 number was the number Thomas had registered with Probation and Parole.[18]

- In one case, Thomas included photos of where the victim was located. A BMW steering wheel can be seen in the photos and one of Thomas's cars was a BMW "DE reg. 311630." [19]

   *3.     The Warrant to Search the Pink iPhone*

Based on the facts provided in the affidavit, a Justice of the Peace Court granted the search warrant application the same day. It issued the following Search Warrant to search the Pink iPhone:

> [P]ink iPhone XR cell phone # _____8763 for the purpose of obtaining cell phone call log and text messages log and the associated dates and times. Any applications/social media capable of sending/receiving text messages or making/receiving phone calls as well as any attached storage devices which may hold text messages log or phone calls log, from 02/22/19 to 0001 hours to 01/18/20 at 2359 hours. The content of any photos or videos from iPhone XR Wireless cellular telephone number _____-8763 not subject to the above time frame (no limitations) for the purpose of this detective's ongoing investigation related to the crime of stalking, DE 11:1312:00a1:FG that may be contained on the device described in the annexed affidavit and application or complaint.[20]

---

[16] *Id.* (Affidavit ¶ 10).

[17] *Id.* (Affidavit ¶ 11).

[18] *Id.* (Affidavit ¶ 12).

[19] *Id.* (Affidavit ¶ 13).

[20] *Id.* at A036–37 (Approved Search Warrant (Pink iPhone)); *see also* B75.

*C. The Indictment*

On March 2, 2020, a New Castle grand jury returned a superseding indictment, charging Thomas with one count of Stalking, two counts of Aggravated Act of Intimidation, six counts of Terroristic Threatening, three counts of Non-Compliance with Bond Conditions, ten counts of Harassment, three counts of Criminal Contempt of a Domestic Violence Protective Order, seven counts of Criminal Contempt, and two counts of Endangering the Welfare of a Child.

*D. The First Motion to Dismiss Current Counsel and/or Appoint New Counsel*

On September 22, 2020, Thomas, without his counsel's assistance, filed the First Motion to Dismiss Current Counsel. In this motion, Thomas sought the appointment of substitute counsel. He did not seek to proceed *pro se*.[21] The trial court responded in a letter to Thomas, which copied the State and defense counsel.[22] It explained to Thomas that because he was represented by counsel and had not been granted permission to participate with his counsel in the defense, Superior Court Criminal Rule 47 precluded the court from considering Thomas's *pro se* application.[23] However, the trial court noted that Thomas's counsel had filed a Motion to Suppress and a Motion for a Bill of Particulars on November 6, 2020, and indicated that the court would address concerns regarding

---

[21] App. to Answering Br. at B46–49 (First Motion to Dismiss Current Counsel).

[22] *Id.* at B50. The record indicates defense counsel was copied on this letter, but at Thomas's sentencing hearing, defense counsel indicated that she was never made aware of the First Motion to Dismiss Counsel.

[23] App. to Answering Br. at B50 (Letter from Eric M. Davis, Judge, to Shamayah Thomas (Nov. 12, 2020)).

representation at the hearing on those motions. Those hearings were held on August 11, 2021, and October 5, 2021. Thomas's First Motion to Dismiss Current Counsel was not addressed at either hearing or any time prior to trial.

### E. The Motion to Suppress Digital Evidence

On January 4, 2021, Thomas's counsel filed the Motion to Suppress, and thereafter, the trial court held a suppression hearing (the "Suppression Hearing") to address the Motion. In his Motion to Suppress, Thomas argued, among other things, that the Search Warrant to search the content of the Pink iPhone was an unconstitutional general warrant that authorized officers to conduct an exploratory search of the phone. At the Suppression Hearing, three officers from NCCPD, including Detective Herrera-Cortes, testified as to Thomas's arrest and the seizure of the Pink iPhone.

In a bench ruling issued during an October 19, 2021 status conference (the "Status Conference"), the trial court denied in part, and granted in part, Thomas's Motion to Suppress.[24] As to Thomas's Search Warrant claim, the trial court found that the Search Warrant was not an unconstitutional general warrant, but that it was an overly broad warrant.[25] Because the warrant was overly broad, but not general, the trial court corrected

---

[24] App. to Opening Br. at A067–72 (Status Conference at 10:3–30:13). Thomas also argued that the Pink iPhone had been improperly seized without a warrant. The trial court rejected this argument. Specifically, the trial court found that "the police did not need a search warrant to seize Thomas's iPhone, as it was the instrumentality of his crimes, a seizure incident to a lawful arrest, and in plain view." *Id.* at A067 (Status Conference at 10:3–9). Thomas does not challenge this ruling on appeal.

[25] *Id.* at A068 (Status Conference at 14:16–18).

9

the issue by "restrict[ing] the evidence to that evidence supported by probable cause found in the four corners of the warrant."[26]

The trial court distinguished the warrant in Thomas's case from those in *Wheeler v. State*,[27] *Buckham v. State*,[28] and *Taylor v. State*.[29] It observed that the warrant in *Taylor* "authorized a top-to-bottom search of any and all stored data of the digital contents of the devices," "did not limit the search of the cell phone to any relevant time frame," and "like the warrants in *Buckham* and *Wheeler*, the *Taylor* warrant used open-ended language 'including but not limited to' to describe the places to be searched."[30] The *Taylor* warrant "allowed investigators to conduct an unconstitutional rummaging through all of the contents of Taylor's smartphones to find whatever they decided might be of interest to their investigation."[31] The trial court found that "[a]fter the Supreme Court's recent decisions, a search warrant for electronic devices must contain more than a general authorization to search all of the contents of electronic devices for evidence of criminal conduct."[32] In this case, it found that the Search Warrant "does not authorize a general authorization to search

---

[26] *Id.* (Status Conference at 14:19–21); *see also id*. at A71 (Status Conference at 27:19–23) ("The Court finds that the warrant is not a general warrant; however, it is any overly broad warrant — not as specific as it could have been, but facts do support a more limited search.").

[27] *Wheeler v. State*, 135 A.3d 282, 304 (Del. 2016).

[28] *Buckham v. State*, 185 A.3d 1, 15 (Del. 2018).

[29] *Taylor v. State*, 260 A.3d 602 (Del. 2021).

[30] App. to Opening Br. at 069 (Status Conference at 18:20–19:8).

[31] *Id.* (Status Conference at 19:9–14).

[32] *Id.* (Status Conference 19:16–21).

all contents of the phone."[33] Instead, the "warrant is tailored to the suspected crime, the suspected instrument of the crime, specific dates – paren – (dates associated with the purported criminal acts) – end paren – and only limited sections of the phone."[34] The trial court further noted that "[t]he facts for supporting probable cause for this search are set out in the supporting affidavit of probable cause at Paragraphs 4 though [sic] 11, 13, and 17."[35]

Finally, the trial court noted the legal distinction between overly broad warrants and general warrants, and the attendant remedies for the respective violations: "With an overly broad warrant, the defects in the warrant can be remedied by limiting the State's evidence to the time frame for which the warrant provided probable cause."[36] By contrast, "[t]here is no room . . . for limited suppression of evidence seized under a general warrant."[37] Accordingly, to remedy the overly broad nature of the Search Warrant, the trial court limited the scope of the phone calls and messages to be searched to those to and from the victims, or referencing them.[38] Furthermore, the court limited the time range to search cell phone call logs, text message logs, and applications or social media capable of receiving text messages or calls and their storage devices to January 1, 2020, through January 18,

---

[33] *Id.* at A070 (Status Conference at 22:3–6).

[34] *Id.* at A070 (Status Conference at 22:6–11).

[35] *Id.* at A071 (Status Conference at 24:3–6).

[36] *Id.* at A070 (Status Conference at 20:3–7).

[37] *Id.* (Status Conference at 20:8–10).

[38] *Id.* at A072 (Status Conference at 28:4-30:10) (stating, "[a]s such, the evidence will need to be limited to phone calls to and from V1 and V2, and/or referencing V1 and V2 . . .. And they can't just be any and all text messages; it has to be limited to any and all text messages that are referenced to victims, V1, V2 and whoever is in Paragraph 4, and/or messages that relate to those persons within the time frame that I have set out.").

11

2020.[39]  It placed no time restriction on photographs and videos because it acknowledged

that Thomas may have taken certain photos before he sent them to the victims.[40]

### F.  The Bench Trial

Thomas's bench trial began on October 25, 2021, and lasted two days.  On October

27, 2021, the trial court found Thomas guilty of one count of Stalking, two counts of

Aggravated Act of Intimidation, three counts of Terroristic Threatening, three counts of

Harassment, two counts of Non-Compliance with Conditions of Bond, two counts of

Criminal Contempt of a Domestic Violence Protective Order, and two counts of Criminal

Contempt.  The court found Thomas not guilty of three counts of Harassment, both counts

of Endangering the Welfare of a Child, and one count of Terroristic Threatening.[41]

The State proved its case through the testimony of seven NCCPD officers, testimony

from personnel regarding GPS and verification of phone numbers, court records, call detail

records for the victims' phone numbers, Officer Cronin's bodycam footage recorded in

A.S.'s home on January 11, photographs of text messages taken of the victims' phones by

NCCPD officers, screenshots of text messages taken by the victims and sent to NCCPD

---

[39] *Id.* (Status Conference at 28:12–23) (stating that the Court would "limit the time range for:  Any cell phone call log, and text messages log and the associated dates and times; any application/social media capable of sending/receiving text messages or making/receiving phone calls, as well as any attached storage devices which may hold text messages log or phone calls log.  The time range will be limited to January 1, 2020, through January 18, 2020.").

[40] *Id.* (Status Conference at 29:1–10) (explaining that the Court would "place no limit on photographs or videos except that seizure at this point is limited by Paragraph 13.  The photo section of the phone is like – the reason I am doing this is I think the phone section of a smartphone is like a pre-smartphone photo album.  You don't date them.  You search the album to find any photos to share that are identified in the warrant.").

[41] *Id.* at A280–302 (Transcript of Bench Ruling dated Oct. 27, 2021).

officers, in addition to the evidence admitted from the extraction from Thomas's cell phone. Thomas did not testify or put on any defense witnesses.

From the phone extraction, the State introduced at trial: (1) the extraction summary report, (2) the messages sent between Thomas and A.S. on January 10, 2020, (3) the messages sent between Thomas and S.M. on January 11, 2020, including the attached image of two guns, and (4) messages sent between Thomas and A.S.'s sister on January 11, 2020.

### G. Thomas's Second Motion to Dismiss Current Counsel and/or Appoint New Counsel

Following his conviction, on March 17, 2022, Thomas filed his Second Motion to Dismiss Current Counsel. The Second Motion to Dismiss Current Counsel was not received by the trial judge or defense counsel due to a procedural error on the part of the prothonotary's office.[42] Accordingly, the first time the trial court was made aware of the Second Motion to Dismiss Current Counsel was at Thomas's sentencing hearing. At sentencing, the trial court addressed the Second Motion to Dismiss Current Counsel by giving Thomas the option of either retaining his then-current counsel for sentencing and delaying sentencing, or proceeding *pro se*. Specifically, the trial court held the following colloquy with Thomas:

---

[42] *Id.* at A304 (Transcript of Sentencing at 2:17–3:11) [hereinafter Sentencing]. The judge explained that it is typical procedure for the prothonotary to make a copy of the motion and send it to the defense counsel; the defense counsel claimed that she did not receive the motion. *Id.* (Sentencing at 6:12–23). The record demonstrates that the motion was forwarded only to the State. *Id.* at A030 (Memorandum: Documents from Defendant received by the Court on: 3/22/2022, dated Mar. 28, 2022).

13

THE COURT: . . . Please stand for a second, Mr. Thomas. You have the one [motion], but that was done way before the trial in 2020. I don't have any subsequent letters. Do you wish to be represented by Ms. Germono?

THOMAS: For sentencing, it's just a sentencing, so I guess I have no choice.

THE COURT: You do have a choice. I'm asking you, do you wish to be represented by Ms. Germono during sentencing? That is not a demand, that is a question, and we can go through the process and I can delay sentencing if that's what you desire and you can– do you want an opportunity – is there an interview cell, Ms. Germono, here on this floor? Do you want to take a break? Let's take a break and you go talk to Mr. Thomas. Let's not do it in the courtroom, let's give you some time talk to him, see what he wants to do and advise him of different things. *He can represent himself during his sentencing*. The other matter was long ago, I didn't handle the 2020 one, but this trial is not in 2020, but why don't you talk so you can understand what choices you do have. I'm not going to – I don't want to – I don't think you have to have representation, if that's what your concern is, I mean, very strong representation during your motion to suppress, potential appeal points as you recognize when you did an interview with the PSI, which I think is a little different than the previous person who did interview. I mean, I understand why you didn't talk, but why don't I give you five minutes or more, if you need it, we'll take a recess and I'll let you talk to Ms. Germono and then make your determination, because you do have a choice, and sentencing is very important, and she'll tell you, too, that you have to be careful how you present and what you say to the judge because it may have some consequences. But I'll give you the time, and I do think you have a choice as to what you want to do here, and, I mean, you are facing mandatory time anyway, it's not like you are going to walk away today with the sentencing, so if you want some type of recess or anything, lets talk about it. We don't have a victim in the courtroom, so. But I do want you to think you have a choice and I want you to talk to Ms. Germono about your different options, okay, and then I'll come back and talk to you, all right?

THOMAS: All right.

. . .

THE COURT: I have a question, too, Ms. Germono, you say you never received a copy of the motion?

DEFENSE COUNSEL: I don't recall receiving it.

14

THE COURT: I don't have one in my file, by the way.

DEFENSE COUNSEL: I don't recall receiving it, because if my client asked to represent himself at trial, we would have done the colloquy. I don't recall him talking to me about that or receiving this.

THE COURT: Actually, it should have been done at the case review, that's why I'm saying I wasn't involved.

DEFENSE COUNSEL: Right, and so the first time is when [the State] brought this up today. I don't remember receiving this motion at all.

THE COURT: Because generally what the prothonotary does is they make a copy of the motion and send it directly to defense counsel because sometimes they are not served, that's why I was asking. It's our procedure, the judges agree, that any motion, even if it's in violation of Rule 14 or 40 or whatever it is, we make a copy and we immediately send it to the defense counsel so that they are made aware of the motion, and you are saying you didn't receive it?

DEFENSE COUNSEL: I don't recall receiving it, Your Honor.

THE COURT: All right. Mr. Thomas, please stand. You can take your mask off. Did you have an opportunity to talk to Ms. Germono about your request to represent yourself?

THOMAS: Yes.

THE COURT: Okay, and do you wish to represent yourself at sentencing?

THOMAS: For sentencing I'd rather keep her.[43]

Based on this colloquy, Thomas's trial counsel represented him at his sentencing hearing. At that hearing, the trial court sentenced Thomas to an aggregate of 36 years of Level V incarceration (with credit for fourteen days previously served), suspended after ten years for decreasing levels of supervision.

---

[43] *Id.* at A304–05 (Sentencing Hearing at 3:12–7:10).

## H. Contentions on Appeal

### 1. Thomas's Contentions

Thomas sets forth two claims on appeal. *First*, Thomas argues that the trial court erred when it categorized the Search Warrant as an overly broad warrant, as opposed to an unconstitutional general warrant and as a result, Thomas's rights under the United States and Delaware Constitutions were violated. He claims that the Search Warrant was general because it did not specify the particular items to be searched on the iPhone and it had no limitations or scope (*i.e.*, it used words like "any" and "no limitations"), which resulted in a limitless investigation into Thomas's personal effects.[44] Thomas argues that but for the

---

[44] Opening Br. at 16, 17. Thomas's opening brief also takes issue with the fact that the State extracted all of the data from the Pink iPhone. The State explained that it is technologically limited in this regard and is only able to extract all data from a smart phone, not particular types of data. This does not mean that the State uses the data in violation of the search warrant. Answering Br. at 19–20. Thomas conceded at oral argument that he does not challenge the State's method of extraction. The following exchange occurred:

> THE COURT: I wanted to clarify your argument because there's reference in the – both in the briefing and in the court's decision and the arguments before the court below that the way the extraction was conducted for the Pink iPhone pulled all the data off the phone, not just the time limited and particular types of data that were authorized in the warrant. Is that the basis for your argument that this was a general warrant, the actual way the extraction was conducted? Or is your argument that the warrant itself and the language like in terms of what it authorized to be searched is what makes it a general warrant?

> THOMAS'S COUNSEL: The warrant itself, Your Honor.

> THE COURT: Okay, so are we really worried at all about how the extraction was conducted for purposes of this appeal?

> THOMAS'S COUNSEL: No, Your Honor. Mr. Thomas will concede that the extraction itself is, uh, due to the limitations. Cellebrite is the gold standard in terms of what most law enforcement agencies in Delaware use, all the major police agencies use it. I wish there was a better way, but that's what the law enforcement has right now.

Delaware Supreme Court, *Oral Argument Video: Thomas v. State*, *268, 2022*, Vimeo, at 4:10–5:21 (July 26, 2023) https://livestream.com/accounts/5969852/events/10877231/videos/237023169

introduction of evidence obtained from the general warrant, the State would not have been able to support Count IV, Felonious Noncompliance with Bond, and Count VI, Harassment.

*Second*, Thomas argues that the trial court failed to adequately address his Motions to Dismiss Counsel when it failed to make a thorough inquiry into the substance of his Motions to Dismiss Counsel. He argues further that the trial court erred when it failed to forward either of Thomas's Motions to Dismiss Counsel to his then-current defense counsel. According to Thomas, this procedural mishap caused the court to overlook his request to proceed *pro se*, and requires us to remand the case for a new trial. Moreover, Thomas claims that had he received proper documents from his counsel — such as discovery and suppression hearing transcripts — the outcome of his case would have been different.

### 2. The State's Response

The State counters that the Search Warrant was sufficiently particular to pass constitutional muster. This is because the Pink iPhone was the instrument of the crime and the authorized search was limited to certain sections of the phone, namely, those where call and message logs and messages themselves might be found, along with videos and photographs stored on the phone. In addition, the search for messages and calls was limited

[hereinafter Oral Argument at __]. We observe, in any event, that the State represented in its Response to Motion to Suppress Digital Evidence (Pink iPhone) that it did not review anything outside of the temporal scope of the warrant for use in its case-in-chief, and that it agreed that anything outside the temporal scope of the warrant could not be used in its case-in-chief absent another lawful search. App. to Answering Br. at B96–97.

in time frame. Finally, because the warrant was overbroad — as opposed to general — the trial court properly concluded that the remedy was to strike the portions of the Search Warrant that were invalid for lack of probable cause.

*Second*, the State claims that the Superior Court did not abuse its discretion in declining to grant or hold a more extensive hearing to address either of Thomas's Motions to Dismiss Counsel. As a threshold matter, neither of the two Motions to Dismiss Counsel indicated that Thomas wanted to proceed *pro se*. Accordingly, the trial court was not required to inquire further into the matter as would be required for an invocation of the Sixth Amendment right to represent oneself recognized in *Faretta v. California*.[45] Instead, the Motions asked the trial court to appoint new counsel. The State argues that a motion to appoint new counsel is not a clear and unequivocal assertion of a defendant's right to self-representation, and, in any event, the reasons Thomas gave for his dissatisfaction with trial counsel did not justify the appointment of new counsel. Thus, any failure to address the First Motion to Dismiss Current Counsel, which was undeniably filed in violation of Superior Court Criminal Rule 47, was harmless. Finally, with respect to the Second Motion to Dismiss Current Counsel, even taking into account the prothonotary's procedural error, the trial court acted within its discretion in addressing Thomas's motion prior to sentencing.

---

[45]Answering Br. at 22–23 (citing 422 U.S. 806 (1975)).

18

## II.  SCOPE AND STANDARD OF REVIEW

As to Thomas's claim that the Superior Court's admission of evidence collected from the Pink iPhone violated his constitutional rights, this Court reviews "alleged constitutional violations *de novo*,"[46] and we apply "a *de novo* standard of review to the Superior Court's legal conclusions regarding the denial of a motion to suppress."[47] However, "[w]e review the trial judge's factual findings [on a motion to suppress] to determine whether there was sufficient evidence to support the findings and whether those findings were clearly erroneous."[48]

Thomas's second argument challenges the trial court's denial of his Motions to Dismiss Counsel.  The decision to appoint substitute counsel is reviewed for abuse of discretion.[49]  "An abuse of discretion occurs if the trial court's decision is based on clearly unreasonable or capricious grounds."[50]

## III.  ANALYSIS

For the reasons set forth below, we conclude that each of Thomas's claims on appeal lacks merit.  The Superior Court did not err in holding that the Search Warrant was overbroad, not general, and in redacting the Search Warrant to protect Thomas's constitutional rights.  Further, the Superior Court did not abuse its discretion when it

---

[46] *Taylor*, 260 A.3d at 612.

[47] *Id.*

[48] *Id.* (quoting *West v. State*, 143 A.3d 712, 715 (Del. 2016)) (alteration in original).

[49] *Joyner v. State*, 155 A.3d 832, 2017 WL 444842, at *3 (Del. Jan. 20, 2017) (TABLE).

[50] *Bultron v. State*, 897 A.2d 758, 762 (Del. 2006) (citation omitted).

declined to grant a more extensive hearing to address either of Thomas's Motions to Dismiss Counsel because Thomas never clearly and unequivocally asserted the right to represent himself. Nor did he show good cause for the court to appoint substitute counsel. Instead, he chose to proceed with his then-current counsel when given the opportunity to proceed *pro se* at his sentencing hearing. Accordingly, we AFFIRM Thomas's convictions and sentence.

### A. Thomas's Search Warrant Claim

#### 1. The Fourth Amendment Claim

Thomas challenges the Search Warrant under the Fourth Amendment to the United States Constitution. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[51]

Although Thomas briefly cites Article I, § 6 of the Delaware Constitution, Thomas has not fairly presented any separate argument under the Delaware Constitution. As we have stated, "the proper presentation of an alleged violation of the Delaware Constitution should include a discussion and analysis of one or more of the following criteria: textual language, legislative history, pre-existing state law, structural differences, matters of particular state interest or local concern, state traditions, and public attitudes or other

---

[51] U.S. Const. amend IV.

20

applicable criteria."[52]  As a matter of course, this Court does not address state constitutional claims when a party "does not specifically brief an argument under the Delaware Constitution or indicate why the outcome would be different under the Delaware Constitution as opposed to the Fourth Amendment."[53]  Thus, we will only consider his claims under the Fourth Amendment.

The warrant requirement guards against unjustified, personal intrusions in two ways.[54]  First, it prevents searches not based on probable cause, and "ensures that 'those searches deemed necessary [are] as limited as possible[,]' as the evil of unrestrained searches 'is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings.'"[55]  This second assurance is "achieved by enforcing the particularity requirement."[56]  That requirement, enshrined in the Fourth Amendment, and 11 *Del C.* § 2307(a), provides that "[t]he warrant must describe the things to be searched with sufficient particularity and be no broader that the probable cause on which it is based."[57]

---

[52] *Lloyd v. State*, 292 A.3d 100, n.48 (Del. 2023) (citing *Ortiz v. State*, 869 A.2d 285, 491 n.4 (Del. 2005), *overruled on other grounds by Rauf v. State*, 145 A.3d 430 (Del. 2016)).  As we stated in *Jones v. State*, these features reflect "that distinctive and identifiable attributes of a state government, its laws and its people justify recourse to the state constitutions as an independent source for recognizing and protecting individual rights."  745 A.2d 856, 865 (Del. 1999).

[53] *Womack v. State*, 296 A.3d 882, 899 n.37 (Del. 2023).  *See also Thomas v. State*, 293 A.3d 139, 141 (Del. 2023) ("Summary arguments unsupported by legal argument, analysis, and authority are waived.  Thus, we will not consider Thomas's state constitutional claims.") (internal citation omitted).

[54] *Wheeler*, 135 A.3d at 298 ("The warrant requirement addresses the Framer's concerns in two ways.").

[55] *Id.* (citation omitted).

[56] *Id.* at 298–99.

[57] *Id.* Delaware's constitutional protections are buttressed by statute.  11 *Del. C.* § 2307(a), in part, provides: "The warrant shall designate the house, place, conveyance or person to be searched, and

21

## 2. *The Particularity Requirement as Applied to Warrants to Search Digital Devices*

This Court, in *Wheeler v. State*, considered "for the first time, a challenge to warrants seeking to seize and search computer-based and digital items on the grounds that they are in the nature of a general warrant, unconstitutionally overbroad, and lack sufficient particularity."[58] There, we acknowledged that "[w]arrants directed to digital information present unique challenges in satisfying the particularity requirement, given the unprecedented volume of private information stored on devices containing such data."[59] After a comprehensive review of how other courts, federal and state, have addressed the issue, we concluded in *Wheeler* that "[a] key principle distilled from the jurisprudence in this area is that warrants, in order to satisfy the particularity requirement, *must describe what investigating officers believe will be found on electronic devices with as much specificity as possible under the circumstances*."[60]

In *Wheeler,* the defendant was accused of sexually abusing two brothers he lived with in his youth, and then interfering with their ability to disclose the abuse to law enforcement. He was also accused of abusing his adopted son. In executing two warrants issued to investigate the witness tampering charges, law enforcement discovered child

---

shall describe the things or persons sought *as particularly as possible*." 11 *Del. C.* § 2307(a) (emphasis added).

[58] *Id.* at 302.

[59] *Id.* at 299.

[60] *Id.* at 304 (emphasis added).

pornography cached on one of Wheeler's iMac computers.[61]  Based on that discovery, law enforcement obtained a warrant to investigate Wheeler for child pornography charges, which led to Wheeler's eventual conviction in the Superior Court of Dealing in Child Pornography.  The witness tampering warrants were almost identical to the warrant later issued for child pornography.[62]  On direct appeal, Wheeler challenged the warrants issued for witness tampering as violative of the United States and Delaware Constitutions' particularity requirement.  We agreed, and we reversed Wheeler's conviction.

The affidavits supporting the witness tampering warrants in *Wheeler* mentioned written communications, including letters, address books, and handwritten notes, between the victims and Wheeler.[63]  However, the witness tampering warrants in *Wheeler* authorized law enforcement to:

> 2. *Search the following location within the residence described herein the application and affidavit [sic]* **to include but not limited to***:  locked or unlocked safes, boxes . . . found in or upon said residence that could be used to contain evidence[.]*
>
> 3. **Any** *personal computer, computer system, device or component to include desktop(s), laptop(s) notebook(s), [etc.] . . ..*

---

[61] *Id.* at 284.  Wheeler was charged with twenty-five identical counts of Dealing in Child Pornography based upon twenty-five images of child sexual exploitation — all of which were found on the iMac.  He had numerous other computers and electronic devices which were also seized.

[62] *Id.* at 285.  The State admitted that the challenged witness tampering warrants were virtual copies of an off-the-shelf warrant for child pornography.  It was apparent from the language cut and pasted from a child pornography warrant that the State was interested in finding evidence of child pornography as opposed to witness tampering.

[63] Law enforcement formed this belief because the victims had already provided law enforcement with copies of letters that Wheeler had sent them.  *Id.* at 288.

4. **Any** digital or optical data storage device connected to, capable of being connected to read by, [etc.] . . . or any other such device that stores digital data optically, electronically, or magnetically.

5. *Any* cellular telephone, to include the registry entries, call logs, pictures, video recordings[,] text messages, user names, buddy lists, screen names, telephone numbers, writings or other digital material as it relates to this investigation.

6. *Any* digital camera, digital video camera, optical camera, optical video-camera, cell phone, *or other device* capable of capturing and storing to any media, photographs, or images and the associated media there from [sic].

7. *Any and all data*, and the forensic examination thereof, *stored by whatever means* on *any items seized* pursuant to paragraphs 4, 5, and 6, as described above to include but not limited to:   registry entries, pictures, images, temporary internet files, internet histories files . . . or other evidence.

8. *Any* file, writing log, artifact, paper, document, billing record or other instrument stored electronically or in printed form, which relates to or references the owner of the items seized pursuant to paragraphs [] 2, 3, 4, 5, 6, 7, and 8 as described above.[64]

In reviewing the *Wheeler* warrant, we applied the "guiding metric," that "'officers must describe what they believe will be found on a computer with as much specificity as possible under the circumstances[,]' and that '[t]his will enable the searcher to narrow his or her search to only the items to be seized.'"[65]  That did not happen in *Wheeler*.  Although we did not "prescribe rigid rules" for warrants, [66] we held that:

[w]here, as here, the investigators had available to them *a more precise description of the alleged criminal activity that is the subject of the warrant*, such information should be included in the instrument and the search and

---

[64] *Id.* at 289 (emphasis added).

[65] *Id.* at 304 (quoting *State v. Castagnola*, 46 N.E.3d 638, 659 (Ohio 2015)).

[66] *Id.* at 305.

seizure should be *appropriately narrowed to the relevant time period* so as to mitigate the potential for unconstitutional exploratory rummaging.[67]

We observed that the State had conceded that nothing related to one victim would be found on Wheeler's property identified in the challenged warrants. As to the only other potential victims, the alleged witness tampering would have occurred, if it did, in or after July 2013. Yet the warrants were "boundless as to time."[68] The iMac computer on which the twenty-five images (which formed the basis of his prosecution) were found had last been powered on in September 2012. Thus, the iMac "logically could not have contained material created or recorded during the relevant time period."[69]

Beyond the lack of any temporal limit,[70] we noted that, although the State claimed it was searching for "evidence of written communications" related to witness tampering, nothing in the affidavits "support[ed] an inference that evidence may be found on DVDs or optical cameras."[71] Yet the warrant authorized law enforcement to search such devices. We concluded that the Wheeler warrants' lack of particularity "permitted the species of wide-ranging, exploratory searches the Framers intended to prohibit."[72] Accordingly, we

---

[67] *Id.* (emphasis added).

[68] *Id.*

[69] *Id*.

[70] *Id.* at 304 (stating that the warrant failed to satisfy the principle underlying the particularity requirement in "[o]ne obvious respect" — "the failure to limit the search to the relevant time frame").

[71] *Id.* at 306–07.

[72] *Id*. at 307.

25

held that the witness tampering warrants were general warrants and violated the particularity requirement.

Two years after our decision in *Wheeler*, we again addressed the particularity requirement as it applies to searches of digital devices in *Buckham v. State*.[73] There, the defendant, Buckham, was convicted of assault in the first degree and related charges in connection with a shooting. During their investigation, the police had obtained a warrant to search data on Buckham's smartphone. "[T]he only nexus the warrant application established between his phone and the shooting was that the phone might have contained GPS data that might have been useful to investigators" in determining where Buckham had been during the six weeks prior to his arrest.[74] Nevertheless, the warrant authorized police to search the phone for:

> "*[a]ny and all* store[d] data contained within the internal memory of the cellular phones [sic], *including but not limited to*, incoming/outgoing calls, missed calls, contact history, images, photographs, and SMS (text) messages" for evidence of Attempted Murder 1st Degree.[75]

As a result of their search of Buckham's phone, law enforcement discovered arguably incriminating Facebook messages, which were then introduced at trial over Buckham's objection that the warrant lacked probable cause because it did not allege a sufficient nexus between the crime he was suspected of committing and his cellphone. Despite the fact that Buckham had failed to raise, at trial, the argument that the warrant

---

[73] 185 A.3d 1 (2018).

[74] *Id.* at 19.

[75] *Id.* at 15 (alteration in original).

was so overbroad and lacking in specificity that it constituted an unconstitutional general warrant, we reversed his conviction on that basis. We found that even with the causal nexus regarding the GPS data, "the scope of the warrant so far outruns that probable cause finding – and is so lacking in particularity relative to that probable cause finding – that it qualifies as plain error."[76] Specifically, we explained that:

> The trial court concluded that the affidavit created probable cause to search the phone for GPS data to ascertain where Buckham had been during the six weeks prior to his arrest, but the warrant did not limit the search of Buckham's cell phone *to any relevant time frame and authorized the search of any data on the phone. Worse still, it authorized law enforcement to search categories of data that had nothing to do with GPS location information*, like "incoming/outgoing calls, missed calls, contact history, images, photographs and SMS (text) messages." *So this warrant was both vague about the information sought—despite the fact that a far more particularized description could have been provided— and expressly authorized the search of materials there was no probable cause to search*, like the contents of all of the Facebook messages Buckham sent. For both of those reasons, the warrant is invalid, and the search for and review of the messages violated Buckham's rights under the United States and Delaware constitutions.[77]

Finally, we most recently addressed a similar challenge in *Taylor v. State*.[78] In *Taylor*, the defendant participated in a series of violent crimes that occurred throughout New Castle County in May 2016.[79] In June 2016, Taylor was arrested, and the police

---

[76] *Id.* at 18.

[77] *Id.* at 19.

[78] 260 A.3d 602 (2021).

[79] *Id.* at 604.

applied for a search warrant to search Taylor's multiple smartphones.[80]  The Justice of the

Peace Court approved the warrant which authorized a search for:

> *[A]ny/all data stored by whatever means*, or through normal course of business of wireless services, and/or through the forensic examination of said cellular telephone, *to include but not limited to* registry entries, pictures, photographs, images, audio/visual recordings, multi-media messages, web browsing activities, electronic documents, location information, text messaging, writings, user names, subscriber identifiers, buddy names, screen names, calendar information, call logs, electronic mail, telephone numbers, *any similar information/data* indicia of communication, *and any other information/data* pertinent to this investigation within said scope.[81]

We held that the warrant failed to satisfy the constitutional or statutory requirements that

it describe the items to be searched for and seized with as much particularity as the

circumstances reasonably allow and that it is no broader than the probable cause on which

it is based.[82]  We explained:

> Like the warrant struck down in *Buckham*, the Taylor warrant authorized "a top-to-bottom search" of "[a]ny and all store[d] data" of the digital contents of the devices.  The Taylor warrant also "did not limit the search of [the] cell phone to any relevant time frame . . .." And like the warrants in *Buckham* and *Wheeler*, the Taylor warrant used the open-ended language "including but not limited to" to describe the places to be searched.[83]

*3.      The Legal Distinction Between Overbroad and General Warrants*

Thomas's argument that the Superior Court erred in determining that the Search

Warrant was overbroad, as opposed to general, concerns the legal distinction between

overbroad warrants and general warrants.  We discussed this distinction in *Taylor*, and the

---

[80] *Id.* at 609.

[81] *Id.* (emphasis added).

[82] *Id.* at 615.

[83] *Id.* (citing *Buckham*, 185 A.3d at 15 and *Wheeler*, 135 A.3d at 289).

distinction's implication for the remedies at a trial court's disposal. In *Taylor*, we rejected the State's contention "that defects in the warrant 'could be remedied by limiting the State's evidence to the timeframe for which the warrant provided probable cause.'"[84] We rejected this claim because "[t]here is no room . . . for limited suppression of evidence seized under a general warrant."[85] We cited *United States v. Yusuf*, a decision by the United States Court of Appeals for the Third Circuit, to explain the distinction:

> between a general warrant, which is invalid because it vests the executing officers with unbridled discretion to conduct an exploratory rummaging through [the defendant's] papers in search of criminal evidence, and an overly broad warrant, which "describe[s] in both specific and inclusive general terms what is to be seized," but "authorizes the seizure of items as to which there is no probable cause  . . ."[86] [A]n overly broad warrant can be redacted to strike out those portions of the warrant that are invalid for lack of probable cause, maintaining the remainder of the warrant that satisfies the Fourth Amendment. In contrast, the only remedy for a general warrant is to suppress all evidence obtained thereby.[87]

Thus, if a court determines that a warrant is general, it must suppress all evidence obtained pursuant to it. However, if a warrant is overbroad, but not general, the trial court may narrow it "to strike out those portions of the warrant that are invalid for lack of probable cause, maintaining the remainder of the warrant that satisfies the Fourth Amendment."[88]

---

[84] *Id.* at 617.

[85] *Id.*

[86] *Id.* (quoting United States v. Yusuf, 461 F.3d 374, 393 n.19 (3d Cir. 2006) (alteration in original) (citation omitted)).

[87] In *Yusuf*, the Third Circuit explained that "redaction" means "striking from a warrant those severable phrases and clauses that are invalid for lack of probable cause or generality and preserving those severable phrases and clauses that satisfy the Fourth Amendment." 461 F.3d at 389 (citation omitted).

[88] *Taylor*, 260 A.3d at 617 (citing *Yusuf*, 461 F.3d at 393 n.19); *State v. Freeman*, 2023 WL 2854771, at *6 (Del. Super. Apr. 9, 2023) (citing *Taylor*, 260 A.3d at 617) (explaining the

*4.      The Superior Court Did Not Err in Finding the Search Warrant Overbroad*

Our recent decisions applying the particularity requirement to warrants authorizing searches of electronic devices guide our analysis here. We hold that the Search Warrant describes what investigating officers believed would be found on Thomas's electronic device with as much specificity as possible under the circumstances. Accordingly, the trial court did not err when it deemed the Search Warrant to be overbroad rather than general. It appropriately redacted the evidence to eliminate the portions that are invalid for lack of probable cause.

> The Search Warrant authorizes law enforcement to search Thomas's:

> Pink iPhone XR cell phone #_____8763 for the purpose of obtaining cell phone call log and text messages log and the associated dates and times. Any applications/social media capable of sending/receiving text messages or making/receiving phone calls as well as any attached storage devices which may hold text messages log or phone calls log, from 02/22/19 at 001 hours to 01/18/20 at 2359 hours. The content of any photos or videos from iPhone XR Wireless cellular telephone number _____8763 not subject to the above time frame (no limitations) . . ..[89]

First, the Search Warrant describes the Pink iPhone as the specific place to be searched — and more specifically, the text message/call logs and photos/videos in the smartphone, as well as applications capable of sending or receiving text messages/calls/photos or videos. In *Taylor*, we rejected the idea that identifying a

---

difference between an overbroad warrant, which can be narrowed through limited suppression, and a general warrant, where all evidence obtained thereby must be suppressed); *State v. Calhum*, 2022 WL 18635494, *4 (Del. Super. Apr. 6, 2022) (citing *Taylor*, 260 A.3d at 617) (quoting *Yusuf*, 461 F.3d at 393) (same).

[89] *Id.* at A036–37 (Approved Search Warrant (Pink iPhone)).

smartphone as the place to search would be enough to satisfy the particularity requirement because "[t]he search could have been limited to smartphone data tied specifically to the probable cause supporting the warrant."[90] The Search Warrant here does not authorize law enforcement to search "any and all data on the smartphone,"[91] or certain data "including but not limited to."[92]

We invalidated the warrants in *Wheeler*, *Buckham*, and *Taylor* because investigators had a more precise description of the places to be searched than was provided in the warrant, and there was nothing in those cases to support an inference that evidence would have been found in the less precise locations which the warrants authorized law enforcement to search.[93] Therefore, the warrants in those cases authorized unconstitutional exploratory rummaging. Here, the basis for searching Thomas's Pink iPhone, and certain sections of the device, is apparent from Detective Herrera-Cortes's affidavit. The Pink iPhone was believed to be the instrument of the crime of Stalking. In other words, law enforcement had reason to believe that the phone number associated with the Pink iPhone

---

[90] *Taylor,* 260 A.3d at 616 (stating that "the fact that the investigator identified the smartphones as the object of the search and the data on the smartphones as the things to be searched does not satisfy the particularity requirement. The warrant was not limited.").

[91] *Id.*

[92] *Buckam*, 185 A.3d at 15; *Wheeler*, 135 A.3d at 289.

[93] *Taylor*, 260 A.3d at 616 ("Although the record is not entirely clear, investigators apparently extracted almost all data from Taylor's smartphones from an eleven-year time span, and then searched without restriction for evidence of criminal conduct."); *Buckham*, 185 A.3d at 19 (warrant "authorized law enforcement to search categories of data that had nothing to do with GPS location information [for which there was probable cause to search], like 'incoming/outgoing calls, missed calls, contact history, images, photographs and SMS (text) messages.'"); *Wheeler*, 135 A.3d at 306 (invalidating warrant to search any digital device in part because "nothing in the Affidavits support[ed] an inference that evidence may be found on DVDs or optical cameras").

belonged to Thomas and had been used to contact the victims via phone calls, text messages, and messaging on social media applications.[94]

Second, the Search Warrant was limited temporally: it only authorized officers to search for calls and messages sent or received between February 22, 2019, and January 18, 2020. Although this time frame surpassed that supported by probable cause in Detective Herrera-Cortes's affidavit, it was not unmoored from the facts of the case. In contrast, there was no temporal limitation in *Wheeler*, *Buckham*, and *Taylor*.[95] Here, February 22, 2019 was the date Thomas was released on probation, when he would have had access to the Pink iPhone, and January 18, 2020 was the date of Thomas's arrest and the seizure of the Pink iPhone. As for the lack of temporal limitation on the collection of photos or videos, we agree with the trial court that the nature of photos and videos on an iPhone justifies the lack of limitation.[96] As we noted in *Wheeler*, and again in *Taylor*, this Court will not prescribe rigid rules for the drafting of search warrants: the lack of a temporal limitation on photos and videos does not invalidate the Search Warrant.

---

[94] The Search Warrant authorized law enforcement to search "any" application capable of sending or receiving messages or calls because, as noted in the affidavit supporting the warrant application, law enforcement had reason to believe that Thomas used Facebook messenger to communicate with the victims.

[95] *Wheeler*, 135 A.3d at 305 ("The Affidavits contain no facts suggesting that any tampering might have occurred prior to July 2013. Yet, the Witness Tampering Warrants were boundless as to time."); *Buckham*, 185 A.3d at 19 ("The trial court concluded that the affidavit created probable cause to search the phone for GPS data to ascertain where Buckham had been during the six weeks prior to his arrest, but the warrant did not limit the search of Buckham's cell phone to any relevant time frame . . .."); *Taylor*, 260 A.3d at 604, 616 (no temporal limitation despite all crimes occurring during May 2016).

[96] *Id*. at A072 (Suppression Hearing at 29:1–10). The State did not introduce videos extracted from the Pink iPhone in its prosecution.

Accordingly, the trial court did not err in finding that the Search Warrant was overbroad, and not general. Because the Search Warrant was overbroad, the proper remedy was for the trial court to limit the Search Warrant only to that which was supported by probable cause. Here, the trial court limited the time frame considerably — to January 1, 2020, through January 18, 2020 — and limited the calls and messages to those involving the victims. The affidavit prepared by Detective Herrera-Cortes articulated facts supporting probable cause that information regarding the crime of Stalking would be found in such data. After a *de novo* review of the record here, we are satisfied that the trial court acted properly and with such heightened vigilance and with this Court's guidance in mind. We AFFIRM the judgment of the Superior Court with respect to the admission of evidence extracted pursuant to the Search Warrant.

### B. *Thomas's Motions to Dismiss Current Counsel Claims*

#### 1. *Thomas Never Sought to Proceed Pro Se in Either Motion*

In *Faretta v. California*, the United States Supreme Court held that a state criminal defendant may proceed *pro se* if the defendant knowingly, intelligently, and voluntarily waives the right to counsel.[97] "The trial court, however, is only required to hold a hearing on the defendant's exercise of the right to self-representation *after* the defendant has 'clearly and unequivocally' asserted that right."[98] In *Milton v. State*, this Court addressed

---

[97] *Faretta*, 422 U.S. at 826–32.

[98] *Milton v. State*, 148 A.3d 687, 2016 WL 5415763, at *1 (Del. Sept. 27, 2016) (TABLE) (citing *Morrison v. State*, 135 A.3d 69, 73 (Del. 2016) ("Therefore, once a defendant clearly and unequivocally asserts his right to self-representation, the trial court must proceed with a hearing to make that determination.")).

whether a Delaware trial court must hold a *Faretta* hearing where a criminal defendant submitted a motion to disqualify appointed counsel. The defendant's motion in *Milton* was similar to Thomas's as Milton also claimed that his trial counsel did not file motions upon his request, did not provide him with the materials needed for him to prepare his defense, and did not adequately communicate with him. On appeal, this Court held that Milton's motion to disqualify his appointed counsel did not "clearly and unequivocally" assert his right to self-representation.[99] This was especially true given that the defendant "abandoned his efforts to discharge his trial counsel," once the Superior Court informed him that he would not be given substitute counsel.[100]

By filing the Motions to Dismiss Current Counsel, Thomas did not clearly and unequivocally assert his right to self-representation.[101] Neither of the Motions to Dismiss Current Counsel contains a request to appear *pro se*. In the letter that Thomas sent to the trial court in support of his Second Motion to Dismiss Current Counsel, he referred to his prior motion as a request to dismiss his trial counsel because of her failure to communicate with him, and again, did not articulate a desire to proceed *pro se*. Finally, Thomas declined to proceed *pro se* once given the opportunity at his sentencing hearing.

---

[99] *Id.* at *2.

[100] *Id.*

[101] *Id.*; *Pringle v. State*, 941 A.2d 1019, 2007 WL 4374197, at *2 (Del. Dec. 17, 2007) (TABLE) (denying Pringle's claim that the Superior Court erred in refusing to allow Pringle to represent himself because "[t]he record, however, does not support a finding that Pringle requested to represent himself. In fact, the motion included in Pringle's appendix reflects that, after his conviction, he requested that trial counsel be discharged and that *new* counsel be appointed to represent him at sentencing") (emphasis in original).

"When faced with an ambiguous request for self-representation, a trial court should lean in favor of the right to counsel."[102]  Although it is unfortunate that the prothonotary's office apparently failed to forward either motion to Thomas's trial counsel and failed to forward the Second Motion to Dismiss to the trial court at the time it was submitted, that error does not change the fact that Thomas never clearly and unequivocally asked to proceed *pro se*.  Accordingly, the trial court did not err when it did not conduct a *Faretta* inquiry before denying either Motion.  Instead, the manner of addressing the Motions to Dismiss Current Counsel was within the "broad discretion" of the trial court.[103]  Accordingly, we review the trial court's denial of Thomas's motions for an abuse of discretion.  We find none, as further explained below.

2. *The Trial Court Did Not Abuse its Discretion in Denying the First Motion to Dismiss Current Counsel*

The trial court declined to consider Thomas's First Motion to Dismiss Current Counsel pursuant to Superior Court Criminal Rule 47.[104]  Thomas does not contend that this was error.  Instead, Thomas claims that because the First Motion to Dismiss Current

---

[102] *See Muto v. State*, 843 A.2d 696, 2004 WL 300441, at *2 (Del. Feb. 12, 2004) (TABLE) (quoting *Stigars* v. State, 674 A.2d 477, 479 (Del.1996)).

[103] *Joyner*, 2017 WL 444842, at *3 ("The Superior Court's denial of Joyner's motion to dismiss counsel and appoint new counsel was not an abuse of discretion.  When affirming the Superior Court's decision on this issue, we rely on the broad discretion that a trial judge must be afforded to decide a motion to appoint new counsel.") *accord Trotter v. State*, 2018 WL 6167322, at *3 (Del. Nov. 21, 2018) ("The appointment of new counsel is within the discretion of the Superior Court.").

[104] Superior Court Criminal Rule 47 provides that "the court will not consider *pro se* applications by defendants who are represented by counsel unless the defendant has been granted permission to participate with counsel in the defense."  Del. Super. Ct. R. 47.

Counsel was never forwarded to his trial counsel, he was denied adequate opportunity to voice his desire to proceed *pro se* or to submit a compliant motion to dismiss and/or appoint new counsel.

We reject Thomas's argument for the reasons discussed above. Further, any error with respect to Thomas's First Motion to Dismiss Current Counsel is harmless. "If the reasons [why the accused is dissatisfied with counsel] are made known the court, the court may rule without more. If no reasons are stated, the court then has a duty to inquire[.]"[105] Thomas "stated his reasons at the time he requested new counsel, and he does not identify any other pertinent information that the court should have known before deciding whether to grant his request."[106]

The reason Thomas gave in his First Motion to Dismiss Current Counsel was insufficient to warrant dismissal of his current counsel or appointment of new counsel. "The essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to [ensure that defendant will inexplicably be represented by a lawyer whom he prefers.]"[107] "While a defendant has a right to counsel, he does not have a right to counsel who will not disagree with him about how best to proceed with his

---

[105] *Jones v. State*, 765 A.2d 952, 2000 WL 1504965, at *2 (Del. Aug. 30, 2000) (TABLE) (citations omitted) (finding no error in trial court's failure to question defendant about his dissatisfaction with counsel).

[106] *Id.*

[107] *Bultron v. State*, 897 A.2d at 762–63 (alteration in original) (quoting *Wheat v. United States*, 486 U.S. 153, 160 (1988)).

case."[108]  "[A] defendant's mere dissatisfaction with his counsel does not, by itself, justify the appointment of different counsel."[109]

There is nothing in the record to suggest that Thomas's First Motion to Dismiss Current Counsel was based on anything other than a "mere dissatisfaction" with trial counsel.  In the First Motion to Dismiss Current Counsel, Thomas gave the following reason for his filing of the Motions:  "[Defense counsel] [f]ailed to address charges at preliminary hearing; [f]ailed to file various motions client instructed counsel to file; [a]lso fail[ed] to object at hearings when instructed to by client."[110]  These complaints amount to allegations that trial counsel disagreed with Thomas about how best to proceed with his case.[111]  Moreover, as the Superior Court noted in denying Thomas's First Motion to Dismiss Current Counsel pursuant to Superior Court Rule 47, Thomas's trial counsel had filed the Motion to Suppress and a Motion for a Bill of Particulars.  This indicates that trial counsel was actively engaged in Thomas's defense, even when trial was more than a year away.[112]  Accordingly, any error committed by the prothonotary's office with respect to

---

[108] *Id.* at 763.

[109] *Id.*

[110] App. to Answering Br. at B48 (First Motion to Dismiss Current Counsel).

[111] *See Bultron*, 897 A.2d at 763.

[112] *Joyner*, 2017 WL 444942, at *3.  In *Joyner*, this Court held:

> The record and Superior Court docket reflect that trial counsel filed motions on Joyner's behalf in March and April 2015 and participated in an office conference and final case review in June 2015. Under these circumstances, the Superior Court's decision that Joyner's dissatisfaction with his trial counsel did not justify the appointment of new counsel was not an abuse of discretion.

*Id.*

the First Motion to Dismiss Current Counsel was harmless because Thomas failed to show good cause for dismissing his court-appointed counsel.

### 3. *The Superior Court Did Not Abuse its Discretion in Addressing Thomas's Second Motion to Dismiss and/or Appoint New Counsel*

Thomas waited for more than fifteen months, including the entire duration of his trial, to voice any objection to the trial court's denial of his First Motion to Dismiss. His Motion was tardy, even considering the prothonotary's four-month delay in notifying the trial court and defense counsel of the Motion.[113] The prothonotary's office four-month delay was harmless because by March 2022, Thomas had already been convicted, and no new facts or circumstances about his case arose between March and the date of his sentencing hearing in July.

Moreover, the Superior Court properly addressed Thomas's Second Motion to Dismiss Current Counsel. In *Bultron v. State*, this Court held that "[a]bsent good cause for dismissing court-appointed counsel, a defendant has two options: the defendant may

---

[113] *Muto*, 2004 WL 300441, at *2. In *Muto*, this Court affirmed the denial of the defendant's request claiming that the Superior Court erred in denying his request to proceed *pro se* because he waited until the morning of trial to contest the denial. We stated:

> The Superior Court did not err by denying Muto's request to proceed *pro se*. His motion was tardy. Even considering the Superior Court's delay in deciding his motion for substitute counsel, Muto had approximately two weeks between his receipt of the Court's decision, which notified Muto of his right to seek self-representation, and the first day of trial in which he could have sought to represent himself. Instead, Muto waited until the morning of trial to revisit the issue of substitution of counsel and to ask to proceed pro se.

*Id.* Here, Thomas waited until after the completion of his trial. *See Pringle*, 2007 WL 4374197, at *2 ("Given the timing of Pringle's motion [at sentencing] and the circumstances of this case, we find no abuse of the Superior Court's discretion in denying Pringle's request for substitute counsel.").

proceed either with his court-appointed counsel, or he may proceed *pro se*."[114] Accordingly, the Superior Court did not abuse its discretion when it denied substitute counsel and provided Thomas with the option to proceed with his current counsel or proceed *pro se*, including the option to delay sentencing to afford Thomas time to make his decision.

## IV.    CONCLUSION

For the foregoing reasons, the Superior Court did not err in denying Thomas's Motion to Suppress or in addressing Thomas's Motions to Dismiss Current Counsel. Accordingly, we **AFFIRM** Thomas's convictions and sentence.

---

[114] *Bultron*, 897 A.2d at 763.